United States District Court
Northern District of New York

Case 9:22-cv-00848-GTS-TWD    Document 44    Filed 03/14/24    Page 1 of 12
Case 9:22-cv-00848-GTS-TWD    Document 7    Filed 10/13/22    Page 1 of 10

U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
MAR 14 2024
AT____O'CLOCK
John M. Domurad, Clerk - Syracuse

U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
OCT 13 2022
AT____O'CLOCK
John M. Domurad, Clerk - Syracuse

Alexander Alomar, Plaintiff

2nd Amended Claim of 42 USC 1983

-v-

Docket #: 922-CV-0848

Craig D. Apple Sr., Albany County Sheriff, and County of Albany, C.O. D. Sopko, Lt. J Sherman, Dr. Robert Mirer

### Defendants

The Plaintiff wishes to amend this complaint to reflect the following changes in Defendants: (In their Individual and Official Capacities)
a) Officer Dennis Sopko (the officer working the 7-3 shift on 1 West tier who witnessed the altercation)
b) Lieutenant J Sherman (the shift supervisor/tour commander on the 7-3 shift on March 9th, 2022 who spoke to the individual responsible for attacking plaintiff)
c) Doctor R. Mirer (the Dr. responsible for care and/or scheduling appointments regarding plaintiff's nose, whom plaintiff believes is an employee of Correctional Medical Services, a company Albany County contracts with) ("CMS")
d) Any employee of Albany County Sheriff's Office or CMS involved in the scheduling of Plaintiff's ENT appointment, and/or is involved in the determination of what surgeries are deemed required or elective. (To be determined with Discovery)
2) The original Defendants; Craig Apple and the County of Albany

### Claims

The Plaintiff again claims deliberate indifference to medical needs as well as failure to protect and prays that the following amended Factual Allegations will suffice for the requested relief. The Plaintiff would also like to include Medical negligence as a claim, and failure to train and supervise.

### Factual Allegations

1. In the morning hours of March 9th, 2022, while Plaintiff was housed in the ACJ Protective Custody Tier (1 west), Lt. Sherman made his way through the unit to inspect and observe as required by shift/tour supervisors at least once a shift per policy. Walking with him was Officer D. Sopko.

2. During said walkthrough, Lt. Sherman was stopped by the individual in the cell next to Plaintiff. The individual demanded to be relocated to another part... →

1

...of the jail, even insisting on moving to the other side of the same unit. He claimed he did not feel safe (due to unreported threats from gang members that I had personally witnessed) and Lt. Sherman met that request with a "there's nothing I can really do as far as moving you." That was definitely not true as, upon information and belief, there was always a practice of switching inmates from one side of a tier to another based on security needs, even if it involved swapping a random inmate from the other side to make room. There were also specialized tiers (ie. 4 East, 5 East) which were sometimes used to hold protective custody inmates (including myself later on) as they are keeplock cells as required per ACJ policy. Immediately after Lt. Doe's remark, the communication broke down and became hostile on part of the individual.

3. The individual began by rhetorically asking Lt. Sherman "So I'd be wrong if I bugged the fuck out, right?!" implying physical disturbance, and remained on a tantrum for about a minute before Lt. Sherman stated "I'll tell you what, I'll make sure you stay locked in." As mentioned previously, ACJ policy required that P.C. inmates remained on keeplock 23/1 with the 1 hour being of optional group recreation. Any other time an inmate left their cell everyone else had to be locked in. Officer Sopko was standing next to Lt. Sherman during this entire exchange. After the last remark, Officers and Lt. Sherman walked away and went to the staff room where they talked and Lt. Sherman signed the Log Book.

4. Just a couple hours later, a C.O. came around to make a list of who wanted to go to group recreation outside. The Plaintiff is not sure if this was officer Sopko or the other officer (brother) working on the tier but it was during the same shift and Officer Sopko was still present. When the list came around to the aforementioned individual he told the C.O. that he wanted to go and was put on the list. The Plaintiff would also like to note that it is common practice and upon belief, policy, that there's notes or other methods to cross-reference whether or not someone is eligible or able to participate in recreation (i.e. to enforce no-contact orders, loss of privileges, maintain safety). Even given the span of 20-40 minutes before the gates were all opened for the people who signed up for recreation, Officer Doe made no effort to not let the Individual go to recreation with the rest of the inmates, which is seemingly negligent not only due to the Individual's threat to act out but also because he stated he felt in fear of his life during the earlier interaction with Officer and Lt. Doe ultimately leading to the determination of keeping him locked in.

5. When this list is made (for recreation), the Officer gets the roster and sets the gate control panel into cell groupings, giving them yet another chance to...

2

... do a "double-take" and make sure the list has only eligible people. The gates were then opened and I observed Officer ~~Doe~~ Sopko peering into the hallway while turning the control panel switch and seconds later I was approached and spit on by the Individual who struck me from the side, injuring my nose and taking several shots at the back of my head, leading to a concussion diagnosis. I then regained balance and defended myself and the fight lasted for about 2 minutes until I heard the rear Fire Escape gate open. Under the impression that Officers were responding I distanced myself and walked into the group of onlookers behind me and act as if nothing happened, and Officer Doe walked in from the Fire Escape gate alone carrying a basketball and the Individual who attacked me ran up behind me again and struck me in the back of the head multiple times in front of Officer Doe, who then simply told us to lock in, or else he'll pull the alarm which is why I didn't fight back after the last few hits.

6. Contrary to my original claim stating that Officer ~~Doe~~ Sopko failed to supervise, I now infer that he watched the assault from the very beginning. This is due to my recollection of the ticket subsequent to the fight in which stated that on this date and time Inmate Alomar was attacked by Inmate Collins, and further describes that I fought back. This only would have been known obviously by someone who observed it. I initially observed Officer Doe to the left of my cell peering from down the hallway until confronted by Inmate Collins (the aforementioned "Individual") to the direct right of my cell.

7. A few minutes after being locked in I was asked if I wanted a medical evaluation which I agreed to. I complained about pain in my nose and notified the nurse of all of the punches I took to the back of the head and a basic concussion evaluation was performed. When I asked her if I had a concussion she stated that any serious blow to the head will always lead to a concussion, so in other words yes. After telling her that I could physically feel that my septum was snapped and deviated (which it still is to this day) she scheduled me for an x-ray, gave me Motrin, and Bacitracin to apply on my busted lip. I understand this was probably the most they could have done at the moment but the claims arise from what follows.

8. Either a day or two later I was then brought to the Jail's x-ray room and several scans were taken. After, I believe the images were sent to an outside medical provider for medical diagnosis and came back ~~and came back~~ I believe 4 days later. I was then called down to Dr. ~~Doe's~~ Mirsis office in the infirmary and was told I had a fracture in my septum and some other conditions, and that "the nose needs to be checked out by a specialist ASAP." He understood the urgency because any fracture and/or deviation of the septum needs to be "reset" to it's original position within 14 days or complications can occur and will require steroidal nasal sprays or reconstructive surgery if the injury is serious enough. Of course, as this...

3

...Complaint is on it, the breakage and deviation were left untreated and the Plaintiff suffers complications such as frequent sinus headaches, constant congestion, sharp nerve pains on the line of fracture in my nose, mouth breathing at night (due to nasal congestion) which leads to mouth and throat dryness and often causes Apnea. These conditions are all well known complications of injuries the same or similar to mine and definitely known to a Doctor who works in a violent County jail, hence Dr. Miceli's initial urgency.

9. About 2 weeks after the meeting with Dr. Doe I was then transported to Albany Medical Center's ENT department, on or about March 28, 2022 and 5 days past the 14 day cut-off. We arrived about an hour late to the appointment but the ENT Doctor* still saw me, evaluated my nose alongside a medical student and explained the injuries to her. He went to review the file the ACJ Deputies brought, and after noticing the date of the incident he said "there's a problem, if they brought you here about a week ago I could just reset everything and send you on your way but now this requires reconstructive surgery." I then asked a few questions and was told that 1) it definitely needs to be taken care of, as complications will last until it's fixed 2) I have to allow it 3-6 months to heal before the surgery is performed 3) the surgery is definitely going to hurt (from what I recall, he said the bone has to be rebroken and reset, hence the healing period prior). He then wrote the order/referral for surgery, which is an indicator of the severity of the injury, given the fact that the 2 most common methods of treatment are steroidal sprays/allergy meds/decongestants or to simply let it heal on it's own, these being required if the bone is not reset on time and surgery being the most drastic method I'm aware of. I was not prescribed any steroids and was put on "as needed" allergy meds by the Nurses at the Jail to no avail prior to my ENT visit.

10. The Plaintiff would now like to add some details of his confinement in allusion to the failure to protect claims against Lt. Doe. As I had stated earlier, ACJ has multiple tiers capable of holding P.C. inmates as they are Keeplock. Several days prior to my ENT appointment while on 1 west, an inmate I previously had issues with on my previous tier was moved into my side of the unit. During his time out of his cell he began to come to my cell gate to extort me, or attempt to at least. This inmate has a very long history of violence and was currently booked for 2 Attempted Murders, innocent until proven guilty of course and ironically also assaulted the individual who attacked me prior to him signing into P.C.. After witnessing and being a victim of the conflict with inmate Collins I knew it would be futile to ask an Officer or Supervisor to be relocated and would also draw more unwanted attention which left me with only one option that would keep me out of trouble. I messaged my fiancé on my securus tablet what was going on and she immediately called the jail after shift change, asked to speak to the supervisor and told him the situation. Here comes the shocking contrast: literally no more than 15 minutes later the Sergeant and...

*¹ Scordino

...3 officers were in my cell to ask what was going on and I was promptly escorted off the unit with my belongings to a different location (5 East) and less than a week later I had my designation lowered to level 2 and moved yet again to the North Wing of the A Building, the safest unit in the Jail. To put it more frankly, the very vast majority of officers or supervisory staff won't do anything to fix a dangerous situation unless someone from the outside calls. This is where I also implicate Sheriff Craig Apple and the County of Albany for failure to adequately train and supervise their employees, leading to an extremely dangerous environment due to the blatant disregard of inmate safety, sometimes even intentionally. It's almost as if they don't question the reasons why their Protective Custody Tier is always full and even when you're there you can't even rely on the people that are literally paid to watch you and make sure you don't die. During my time in ACJ (Oct. 14, 2021 - June 27, 2022) there were, upon information and belief, 2 deaths and at least a dozen cuttings/slashings and jumpings.

11. Furthermore, the most dangerous Tiers ironically have no cameras even though a majority of violence is slimmed down to units 1 East and 2 West. Upon my arrival at ACJ and after my quarantine I was placed on 1 East. Literally days after moving in I was forced to fight with another inmate because he's white and I'm Middle Eastern and at the time we were the only inmates on the Tier that weren't black or Hispanic. This was under the threat that if we didn't put on a show for them then we would both get jumped, and me and the inmate I fought are actually good acquaintances to this day. The logical question is, where were the C.O.'s during all of this? Easy answer, playing on their phones in the staff area of the Tier and even going as far as moving their chair out of view of the hallway while 20 inmates, many with a history of rioting and gang violence that are locked up on charges ranging from armed robbery, attempted murder and/or murder, are crammed into a 3.5 foot wide hallway with no cameras. After standing my ground with a few more fights I was deemed "in" and secured my "right" to live there which came with even more problems. The main one being the harassment and threats I received for not helping the gang members jump someone (well, multiple people over a span of time). This brings me to the deliberate and malicious intent of the officers and supervisors. One night, I believe in mid-November to early December an inmate was brought to the unit. This inmate very clearly has special needs and through my observations while in quarantine he has a predisposition to talk, A LOT, leading to conflicts and him immediately signing into P.C., and even being kicked out by P.C. residents, just to give a background on his social issues, but the main issue in this situation was that he was believed to be cooperating against his co-defendant who is a gang member and lived on 1 East. About 10-20 seconds after walking in he was lured to the end of the Tier and jumped. This time, the C.O. watched the entire thing and laughed with their body camera off, of course, as the inmate desperately ran to the front gate and was being chased by...

5

12. The only time I have known of Sheriff Apple's presence inside of an actual living unit (if you could call it that) was in response to being called in because of a riot on 1 East in early 2022 that started over a pair of sneakers that led to multiple inmates being charged and was reported on the local media. If Apple wanted change he would, reasonably speaking, install cameras, promptly investigate violence and staff misconduct, make his actual presence visible rather than his supervisory officers on scheduled and random occasions, and implement a 3rd party investigatory and monitoring organization given how the current grievance system is flawed, with the first step being to attempt to see if your Tier C.O. can resolve your complaint. Half of the time the complaint will be about them or a co-worker, leading most people to not even file a grievance. For the brave souls who do confront them and obviously get denied, the second step is to somehow succeed in getting an official grievance form from them. If you get that far then you have to pray the envelope doesn't "magically" disappear and if it doesn't then you end up at a hearing with a more than likely biased Lt. or Sgt. who doesn't want to be held liable for his subordinates and will "investigate" and deny your grievance by either claiming the event never happened or fabricating a justification. Instead of rectifying the outstanding issues, Apple simply hires more people, mostly in their 20's and some in their teens. These new officers are learning from the methods of career C.O.s and there's not one reason to believe they won't mimic the behavior of their counterparts unless they plan on becoming Sheriff or a policymaker one day and fixing these issues. I don't think it's unreasonable to speculate that Sheriff Apple receives reports about the chronic and serious violence that plagues his jail and it has been going on probably a lot longer than he has been Sheriff and it's hard to believe that he was unaware of it as a Deputy prior to being elected. As the Second Circuit Court of Appeals quoted in Jones v. Town of East Haven (691 F.3d 72) "... such acts would justify liability if ... sufficiently widespread and persistent to support a finding that they constituted a custom, policy or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." This standard holds the County of Albany equally culpable if this Court were to find Apple meets the threshold of deliberate indifference and negligence based on my sworn allegations. In sum, Albany County and Sheriff Apple have effectively done nothing in regards to providing a safe environment to inmates or even their own staff, and fail to properly train, supervise and discipline employees with Apple having actual knowledge of the violations with Albany knowing constructively.

13. Lastly are my claims against CMC* employee(s), including but not limited to, Dr. ~~Doe~~ Mirer who were involved in the determination that the reconstructive surgery was elective and that the County should not have to pay for it. As stated before, an ENT...

*Plaintiff meant CMS

7

... specialist had recommended and referred surgery rather than steroidal medications or any other commonly used treatment due to the severity and recurring symptoms that include sinus headaches which are so frequent I had to stop writing this claim at least 2 dozen times to rest and attempt to decongest, and sleep apnea caused by my dry throat flap adhering and blocking my windpipe which wakes me up in a state of panic in sleep paralysis unable to move or breathe. Somehow these medical "professionals" don't think it warrants a surgery which is only required because they failed to get me to a specialist or bring one in to reset my nose within 14 days despite Dr. ~~Doe~~ Mirer knowing the severity and as a Doctor working in a place like ACJ, definitely should have known what can happen to a fractured and deviated septum or rather the consequences of the person suffering from it if left untreated. To no suprise, he and other employees of CMC* in conjunction with ACJ administrators have a history of negligence and deliberate indifference in regard to medical needs to the point it seems logical to infer there is an active conspiracy in an attempt to not spend their funds on needed care. For instance, an inmate I will call HM, a former United States Marine who I ran across again while in DOCCS shared his story about the aftermath of an event I witnessed while housed on 1 west with him on Feb. 15th, 2022. Of course I asked permission before relaying this story as it involves his subsequent medical diagnosis. On this date, officers raided the 1 west Tier in a large number which included a Jail Commander and at least 2 Sergeants, to search cells. We were taken out 3 or so at a time and had a search conducted. HM was removed from his cell and as the C.O.s began to search his cell he objected to not being able to observe as they scrutinized his legal mail/paperwork and asked to speak to one of the Sergeants. Even though he was physically positioned towards the catwalk and grabbing the bars as required, he slightly turned his head to attempt to speak, which was followed with 3 or so C.O.s approaching him, slamming his face in the gate and twisting his arm backwards and incredibly high. HM recently told me that CMS employees including Dr. ~~Doe~~ Mirer told him he just had a strained/pulled shoulder upon arrival at DOCCS, an MRI concluded he had a torn rotator cuff from the incident. I waited the 3 months prescribed by the ENT Doctor and filled out sick calls to remind CMS employees I still had complications and wanted to know about my surgery. I placed another unrelated sick call in which lead to Dr. ~~Doe~~ Mirer coming to the A Building to give me a paper and I asked him directly as I had received no real answers by way of sick call. He said "Well you're not getting it done while you're here that's for sure, it's elective you can get it when you go home" and walked off. I also recall the specialist asking me during the March appointment if I knew where I'd be in 3-6 months and told him it's up in the air pending a motion to dismiss but there's a realistic chance I'd still be incarcerated, which is the only other reason he wrote an order for surgery then and there. He told me if I did...

\* Plaintiff meant CMS

8

... get released I could just come back to the office and we could schedule a surgery but since there's a probability I'd still be locked up he'll write an order and told the Deputies to make sure it gets transferred with me if I happen to get transferred. I don't think it's rational to believe the surgical order was insignificant to the point of being elective when the only reason it was written is that I was likely to remain incarcerated. CMS employees untimely set up an appointment with the knowledge my 14 days was up and a reset was not going to happen, to see a SPECIALIST, keyword Specialist, implying someone that knew more about noses than anyone at ACJ to see what his recommended course of action would be. Why even take me there if they weren't actually going to listen to his order? A lookup of Correctional Medical Services and Albany on any case reporting database will show a number of suits aimed at the action or inaction of their employees at ACJ with cases sometimes involving wrongful death surviving summary judgement and I would like to again formally charge Albany with negligent hiring in regards to the use of CMS as a contractor, and Sheriff Apple if he was involved in the process of retaining them as well.

Wherefore the Plaintiff seeks the following relief:
a) That Counsel be assigned to assist Plaintiff in litigation
b) an Order compelling Discovery pertaining to: Documentation regarding the 3/9/22 incident (i.e. Tickets, notes, reports, logbook entries, medical report), names of officer and Lt. Doe, names of Dr. Doe and anyone under Second Defendants, Dr. Doe's reports and notes related to my x-ray evaluation post-diagnoses, Body Camera Footage and reports of use of force on February 15th, 2022 on 1 West Tier, Policies regarding the supervision and maintenance of Protective Custody Units and inmates effective in March, 2022, Surgery Referral from Albany Med. ENT circa 3/28/22
c) an Order to send copies of this complaint to the Albany County Sheriff's Office located at 16 Eagle Street, Albany, NY 12227 and the Albany County Clerk.
d) an Order sending copies of this complaint to NYS AG James and the DOJ to investigate these claims
e) Compensatory damages of $920,000 for mental, physical and emotional distress and pain suffered through the Defendants' behavior
f) Punitive damages in the amounts of $15,000 from both Defendants a and b
g) Punitive damages in the amounts of $40,000 and $30,000 from Defendants c and d
h) Punitive damages in the amounts of $125,000 and $250,000 from Defendants' Apple and Albany respectively
i) Declaratory Judgement finding the acts of Defendants in the Factual Allegations to be unconstitutional
j) An Order requiring Defendants to pay for Plaintiff's surgery and follow up care
k) any relief deemed just and proper
L) Preliminary Injunction preventing Plaintiff's return to ACJ

-8-

United States District Court
Northern District of New York

| | |
|---|---|
| Alexander Alomar, <br> Plaintiff | Affirmation of Amended Claim of 42 USC 1983 |
| -v- | 9:22-CV-0848 |
| Albany County, and Sheriff Craig D. Apple Sr., et. al. | |

I, Alexander Alomar, proceeding pro se pending Motion to Appoint Counsel, hereby affirms the contents of this first Amended Claim of 42 USC 1983 to be correct and true to the best of my knowledge, and upon information and belief.

## PLEASE TAKE NOTICE

Pending the results of an appeal regarding a Prison Disciplinary Disposition, the Plaintiff is currently housed in a Special Housing Unit with limited access to certain materials, including my own postage stamps. I have also been notified of a pending transfer to another DOCCS facility to be housed in a Residential Rehabilitation Unit to serve my sentence of Disciplinary Confinement. Plaintiff is not aware of where or when this move will be and prays this Court makes exceptions for time limit violations. The Plaintiff will immediately notify this Court regarding the outcome of my appeal (if it affects my transfer) or my new address if transferred. I also do not have my disbursement sheet that would allow me to make adequate copies of this Claim, and assistance and delivery is greatly appreciated in regard to making and serving said copies.

Alexander Alomar

Sworn Before Me
this 6th Day of October 2022
Dawn M. Calabrese

DAWN M. CALABRESE
NOTARY PUBLIC - STATE OF NEW YORK
Registration No. 01CA5085491
Qualified in Oneida County
Commission Expires: March 2, 2023

Case 9:22-cv-00848-GTS-TWD   Document 7   Filed 10/13/22   Page 10 of 10

Alexander Alomar, 22R1423
**Marcy Correctional Facility**
**Box 5000**
**Marcy, N.Y. 13403-5000**

Marcy
Correctional Facility

NEOPOST
10/07/2022
US POSTAGE $001.05⁰

ZIP 13403
041L11259879



U.S. DISTRICT COURT
JOHN M. DOMURAD, CLERK

OCT 12 2022

RECEIVED

Clerk of the Court
P.O. Box 7367
United States District Court
Northern District of New York
100 S. Clinton Street
Syracuse, New York 13261

Time Sensitive Legal Mail

13261361OO C06I

Alexander Alonso 22B1422

**MOHAWK CORRECTIONAL FACILITY**
6514 Rt. 26
P.O. Box 8451
Rome, N.Y. 13442

NAME: _____   DIN: _____

SYRACUSE NY 130
NEOPOST
12 MAR 2024/KPM 4   03/14/2024
US POSTAGE $00.040
CORRECTIONAL
FIRST CLASS MAIL

ZIP 13440
041M1146909

Attn: 9:22-CV-00848

Clerk James Domurad
US District Court, NDNY
100 S. Clinton St.
P.O. Box 7367
Syracuse, NY 13261

Legal Mail

U.S. DISTRICT COURT
JOHN M. DOMURAD, CLERK
MAR 14 2024
RECEIVED

13261-736767

NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
INCARCERATED INDIVIDUAL CORRESPONDENCE PROGRAM

NAME: Alexander Alomar    DIN: 22R1423

Legal Mail
Mohawk C.F.

Printed On Recycled Paper